Good morning, your honors. Robert E. Bushnell for Mr. and Mrs. Hyatt. This is the 1052D Likelihood of Confusion Trademark Rejection. This is fast. The main issue, there's two marks. We pretty well beat that to death in the reply brief and the brief. I think we know what the issues are. Basically, in the inside flap of the reply brief, we put together a comparison of several leading cases from this court to try to show the pattern and channel, the same purchasers, or the same product. You're only challenging, am I right, that the board's determination regarding the sight, sound, and meaning of the mark? Absolutely not. We're challenging the whole nine yards. But this is, again, this is very brief. I didn't see any challenge to the factual finding that it's the same product at issue. There are no products. In Hewitt-Packard, that's my second issue, but I'll jump to that first. In Hewitt-Packard, the first Packard press case, I think that you found- There are no products? Don't trademarks have to be applied to something? You would think. If you look at the very back in the door, there's a thumb latch to lock the door. On the other side, there's a cylinder and cylinder plug. It says BEST, B-E-S-T. That's not self-flattatory. That's Walter Best. It's a niche product. It means that the janitor can remove it with one twist of the master key. Here, we have Assa. It's a play on a man's name, August Stenum, Stenum August, one of the founders. There are two lock companies, Assa and Kaba. Kaba is Swiss. Assa is Finnish, Swedish. I doubt the court's ever heard of them, but the locksmith has. Now, Monday, I called the- Are there products identified in the application for registration, counsel? That was what happened in the Packard press. Monday, I called the post-registration branch and asked them to cancel the registration they did. They told me to show it canceled by the The application, the registration was filed under 44D and 2B. They canceled 2B, and it's now, or it was before Monday, 44E. There's no products. There never were any products. There's nothing that has twin anything in it. You're seeking to obtain a trademark on no products? We filed under 2B. I'm talking about the registration. The registration is canceled. Yours or theirs? I'm not following. We don't have a registration. We have an application. And you're saying you have arranged to cancel their registration? I'm not following. Yes, it was canceled under 1058. You want to show me this part of the record? If you look at the court's rules, they're very tightly written. There's nothing in there that allows me to file another brief saying, guess what? Since APRA's briefing, new events have occurred. The court didn't have any products. I could never find any products to compare. In fact, there aren't any products. You're saying ASSA has no products? Not under this registration, no. In fact, ASSA, I don't know if I've ever seen an ASSA product in the United States. But if they had, the faceplate of that lock instead of saying BEST would say ASSA Twin IQ. It's the custom. My kitchen door lock, 101 years old, says Sergeant S1. That's the manufacturer and the model. It still works. They've been doing that for a long time. There are no products. That's a second mistake the court made, or the board made. They stepped outside the record of their own appeal and found products. And where is that argument in your brief? It only occurred Monday. Well, of course, we're dealing with a record on appeal. We're not dealing with things that have happened subsequently to the record. We can't ignore that. You will have to file some motion to add evidence which is not currently before the court. You currently have a record and you're held to that record. Or maybe this appeal is moot, if you're saying there's nothing for you to fight against. That could very well be moot, because under the statute 1051, excuse me, 1052D, we look at marks that are so similar, not similar, excuse me, that's not the correct language. Thank you. What we're assessing right now is whether the mark IQ mark, IQ lock, will cause confusion with ASA twin IQ, right? And as the board noted, there's... IQ and IQ, both of those being the dominant feature of the mark, why wouldn't there be confusion? Okay, dominant is a mistake. Dominant is a construct designed by this court to handle those cases where there's a logo. If you look at the court's rulings in giant food... Not necessarily. We very often use that when we're recognizing that parts of the mark have been disclaimed or are descriptive or are for some reason of less significance than the dominant feature. That's the point. And the IQ, suggesting some kind of intelligence and link to a locking function, would have probably a very strong association. That's not what the court's written in how many cases about dominant. Starting with In re Corp's brewing, riddle, shell oil, apparel ventures, going all the way up to Dixie restaurants and giant food. There were logos. That's where this dominant construct came from. Instead of just comparing the word component of the mark... The Dixie restaurants, we're talking about Delta Cafe. That's right. And the court said cafe is a descriptive and therefore less significant term. Delta is the important one, the dominant feature. That's exactly what the law is. As I described it. Right. So can you tell us why that principle doesn't apply to your IQ feature, which is about all of your mark? Lock. Lock is at least descriptive. Lock's descriptive. So we're writing the same feature as Delta Cafe. We're looking at the dominant feature. It's IQ. It seems to be the dominant feature of the ASA twin mark as well. Why don't those... Nobody knows the twin's disclaimed. Second... We know. It's a matter of legal... Because I told you. Well, that's a matter of legal record here. Does anyone know best is disclaimed? It's not. It's the man's name. You would guess it was self-laudatory and disclaimed, but it wasn't. If he registered it. What we're talking about is a distinction between resembles a mark and so resembles a mark. I'm trying to listen. I'm trying to get your answer to my question, which is the dominant features are identical. Why doesn't that support the TTAB result? Because we've dissected the mark. What the TTAB is doing is exactly what this court said. You cannot do in Shen Manufacturing versus Ritzo. Yes, there does seem to be a little overlap between the dominant feature rule and the anti-dissection rule. But why has the TTAB erred in relying on the dominant feature as the more important rule in this context? You're asking me to speculate on why they erred. No, I'm asking you to answer... They don't know what ASSA means. They're unfamiliar with ASSA. They're familiar with Ritz or whatever giant, but they don't know ASSA. Why? They don't change their own locks. The locksmith knows. There's probably no one in this room... So you are attributing the TTAB's error to their misunderstanding of the facts of the case. Correct. They don't know what ASSA means. Now, if she stands up and says, we know what ASSA means, you're going to lose, right? No. So you're gambling. No. I talked to the head of the SBE... You're not allowed to testify as to what you talked about or... I'm not saying she knows or doesn't. You don't have... The point is, I'm trying to tell you, you don't have a right to testify in this court. What you have a right to do is to address the record and answer our questions. The board did consider ASSA and there's several registrations. Whether it was properly before the board or not, they did consider it. That's what I'm testifying to. Now, in the Shen manufacturing, on the first bounce out of five, were five marks there, Shen opposed them. And Shen argued that there was overemphasis on some words, simultaneous underemphasis. And then when you've done that emphasis, Ritz Hotel's mark is identical, namely Ritz. Now, Ritz happens to be a house mark, unlike IQ. The court said this section is impermissible. That's the first that was put on the Ritz application. Court refused the analysis there. Here, I gave you the first four cases, give a very complete analysis of what should be done under substantial evidence. Century 21, In Ray Chatham, Hewitt-Packard. Everybody knew Bill Hewitt and Charlie Packard. You had In Ray Boese here. Everybody knew Mr. Charles Hyken. And then Research Trading, or Research and Trading Roadblock. There was substantial analysis. Is the standard we're applying an everybody-knows standard? You asked me why the board, and I told you I speculated. But here, Century 21, there was a finding of likely confusion based and supported on extensive survey. In Ray Chatham, that were the, I think they were the wrong cases. I've listed them on the cover here. All of those were refused registration under 1021. The second issue was the board erred by making comparisons of non-existent products. I'll reserve the remainder for public. Ms. Kelly?  May it please the court. We're here today because Hyatt has attempted to register a mark for use on identical goods in identical channels of trade. Ms. Kelly, if the registered mark ASSA Twin IQ is no longer being used and has in fact been canceled, how if at all does it change this case? Your Honor, I must confess I did not check this week to see if the mark had been registered. I'm not asking if you checked. I'm asking you if it has been canceled, how does it affect this case? Do you go back and withdraw the appeal before we issue a decision or what? I guess it would be them. But they'd only withdraw it, of course, if you then agreed to allow their mark. What happens? I'd really like to give it some more thought because it didn't occur to me to answer this question coming in. I'm not sure if it was just recently canceled, would there still be product on the shelf? I don't know any of those facts. So I would love to check and get back to the court on the answer to that question. But I am not prepared to answer that question at this particular moment because I don't know. If it was canceled, what the circumstances of the cancellation were, there might be still ASSA Twin IQ products sitting on shelves somewhere where there could be likelihood of confusion with this product. I mean, this is a new assertion. And so what I would like to do, what I would hope would be most efficient for the court, is to assume that we're going on the record as is currently. And then with the court's indulgence, let me get back to you on whether there has been a cancellation or not. I mean, first of all, we don't know that that's a true assertion at this point in time. And please proceed. I apologize. That's sort of the best I can offer you. Proceed with what we have then. Um, so we're talking about a proposed mark to be used in identical goods. There's no dispute here that the registration and the application recite exactly the same goods. There's only the difference of a hyphen in what goods are identified in the application and the registration. They're identified to be used in identical, legally identical trade channels. What about the anti-dissection rule? That's where we come down to the context. Well, that hasn't been violated in this case. In this case, this court has said over and over again, while it's improper to dissect a trademark, it is entirely proper to look at certain features as being more salient than other features. And that seems to be, that's a reasonable rule. Otherwise, you'd only have likelihood of confusion when you had identical marks. I mean, obviously. But why did you discount the word ASSA? I don't think the court did. The board discounted the word ASSA. In fact, they didn't. They said that, they only said that IQ was an essential element. They didn't say it was the essential element. Yes, actually, they said that ASSA is a housemark. And as such, they sort of threw it under the bus. Well, they said it was a housemark, but they didn't throw it under the bus. What they said, if you look at the record at 126As, they said it wasn't sufficient. It wasn't enough to distinguish the use of the arbitrary term IQ. There wasn't enough. And in fact, they said, by the way, even if we are wrong, even if we're wrong that ASSA isn't enough, by saying it's a housemark, it's not enough to distinguish. Even if it's out there, that cuts against Hyatt. Because what, in fact, consumers would be likely to do was to assume that ASSA, maker of the twin IQ, is also the maker of the IQ lock. Particularly, I mean, when you think about it, Hyatt's counsel has said here today that they don't understand, they don't know, they had no notice that twin was disclaimed, but that's on the registration. That's on ASSA's registration. And they also think the public doesn't know that twin is disclaimed. So thus, the public would think, aha, it's twin. That distinguishes it, not realizing that that's either disclaimed or that it's descriptive. Even so, even if we were to assume that to be so, in the record, if you look to the record at A140, appellants had argued to the TTAB that that twin described the twin cylinders, the twin nature of ASSA's locks. It was a descriptive term. And certainly that's something a purchaser would have looked at. And so IQ is the one element that's common to both. And it's the one arbitrary, it's an arbitrary thing in connection with locks. I don't know, never having purchased an electric lock, I have no idea whether the purchaser would know that twin meant something structural or wouldn't. And I don't know if there's anything in the record on that point. Well, there are appellants' own statements. And if you look to the record at page A140, well, they made a whole argument saying that the public would know that. I mean, that's their own assertion that the public would know that. In point of fact, the registrant's goods are a unique niche product that capitalizes on extensive use of twin structures. And they have a whole paragraph going on about that. So if we take them at their word, then the public knows that, hey, ASSA sells a twin IQ. And so if the public were to see IQ lock sitting there, well, maybe this is their non-twin version of an IQ lock. I mean, the board didn't disregard the ASSA being there. They just said, we don't think it's as dominant. And because you've chosen the... You say the board didn't disregard ASSA being there. The board says, generally, likelihood of confusion is not avoided between otherwise confusingly similar marks by adding or deleting a house mark. Yes. To me, I don't see how to read that sentence other than we're going to look at the word IQ, compare it to IQ, and it doesn't matter whether there's an added or deleted house mark. I think that's a narrow reading. I mean, I think that's a narrow reading of what the board said. Because if you follow the page down, the board said, we know that there are obvious difference in appearances and sound. And further down, they say, still, when we look to the sheer dominant term IQ, we find the marks similar in appearance and sound. They're not discounting that there are differences between the marks. How would you say I interpret that sentence? Generally, likelihood of confusion is not avoided by adding or deleting a house mark. They're saying as a general rule. OK, but is that an appropriate general rule? That is the general rule of this court. Really? What case of this court says that a house mark is irrelevant or could be added or deleted, and it won't generally affect a likelihood of confusion analysis? This court has never said that that is a rule, per se. But if you look at the pattern of cases, and actually, if you look at the cases, hiatus provided on the inside of their reply brief cover, they're very instructive on this point. If you look at all the cases where a mark has been refused as being likely to cause confusion, those fact patterns resemble this pattern. But tell me one case where we've said something like this. It's an over... If you look at the pattern created by the cases, and I... Walk me through the cases that create this pattern then. OK, if we look at the Century 21 versus Century... Sorry, just counting a house mark. My partner has just... Because I was stumped here for a second. My partner has just handed me the Celanese Corporation case. But I think if you look here, the board's decision, I don't think the board... I just have to disagree with the premise that the board completely discounted the term ASSA. And I don't think we need to rely on the board as having said that there's a general rule that you can just disregard a house mark. What the board actually said is that the addition or deletion will not usually defeat a likelihood of confusion. And I think that that's a narrow reading of what the board actually said. OK, well, suppose that I read it that narrow way and suppose the rest of the world might read it that narrow way. Would it help for us to make it clear that a house mark is not to be generally disregarded and it is not irrelevant whether it's added or deleted to otherwise confusingly similar dominant marks? Would you agree that that is a correct statement or would the government... I guess what I'm wondering here is you don't seem to be defending what I think the board did. And so does that mean the government is relinquishing that position? I think the government would love it if this court would say that as a general proposition, a house mark will not... The addition or deletion of a house mark will not generally defeat a private patient case of likelihood of confusion. Why? Why should we adopt that principle? Again, I don't think that's the principle that's applied in this case, but here we're talking, what's the most dominant feature of this product is, is the arbitrary portion IQ. ASSA is just telling us, it's telling us, yes, it's telling us who the maker is, but this court's precedent is that when you're in this situation where you have one person using a house mark and another person not using the house mark, that when there is a doubt, you're always going to weigh that in favor of the registrant, of the person who is previously registered. In this case, it's ASSA and ASSA is using that house mark. And so if we have a doubt... Why? Why? Because I certainly don't know what ASSA is. It sounds like an arbitrary, made-up word to me. Now, I'm not the probably relevant, sophisticated consumer purchasers of these particular products, so I certainly... My personal knowledge is irrelevant, but shouldn't the government, when assessing this, take into account what is the relative known or fame of the house mark when making that determination, as opposed to merely saying all house marks are generally not affecting the likelihood of confusion analysis? I think that the fame of the mark definitely could cut... I mean, the fame of the mark can come into play. And it wasn't that the court... It wasn't that the TTAB said that ASSA is completely discounted. It's perfectly proper. For example, in the Hewlett-Packard case, you had two things that are pretty arbitrary. You had two portions of their mark, Hewlett and Packard. They're pretty arbitrary when you put them in the context of computers. I mean, Hewlett and Packard inform you nothing about what a computer is. And Hewlett and Packard, both of those are portions and dominant portions of the mark, an arbitrary connection with the goods. But yet, if you take only one of those components and you put it on some other goods, in that case, it would be connected with some other goods and Packard technologies, and those goods are identical, but you connect it with a different word. That's not sufficient. This court has said there's a likelihood of confusion there. And if you look at the cases, all of these cases that Mr. Hite has kindly provided on the inside of his brief, you don't have to have taken all of the arbitrary or all of the salient features of the mark, all of the nondescriptive terms of the mark, and wholesale taken them over in the junior party of the applicant to find a likelihood of confusion. You don't have to borrow everything. You just have to take a significant and essential element. That's all that's necessary. In each of these cases, so in Century 20, a perfectly good case on this point is the Century 21 case. In that case, you had Century 21 being used and registered for home insurance, and then you had another company coming in, wanting to use just Century, not Century 21, but just the Century portion for Century life insurance. And the TTAB found in this court affirmed that that was significant. Because of the identity of goods and the identity of trade channels, that taking only one portion of an arbitrary trademark, taking only one element and moving it over to the applicants, you know, to the junior party, was sufficient to find a likelihood of confusion. You'll see that in each of the cases here. Let me make sure I understand your argument to me. Is your argument to me then that even Judge Moore, if you think assets should have been considered and you don't think the TTAB did it properly, there's still substantial evidence because ASSA IQ and IQ are still likelihood of confusion? I, yes, given, but again, I'd like to point out that the board didn't disregard ASSA. If you, again, they noted that there were obvious differences. At page 126A, they noted that there are obvious differences. But IQ is the only arbitrary portion of their application. And IQ is an essential element of ASSA Twin IQ. And Ms. Kelly, would you, I want to suspend while you still have a little time left. Stop the clock. And I'd like to consult with my colleagues for one moment. I'll tell you what I'm consulting with them about. These devices help us a lot. My clerks have verified that on November 1st, the ASSA Twin mark was canceled. It was canceled for failure to file a Section 8 statement showing use and commerce. I'd like to speak to my colleagues a minute and then we'll come back to you, all right? Yes. Thank you. These mics are too sensitive. Okay. Mr. Chen, do you want to be part of this? No, thanks. In light of that, do you have any advice for us, Ms. Kelly? Well, the solicitor just checked with our paralegal, in fact, was in the hallway checking with our paralegal and came to the same result that you did, that the mark, in fact, was canceled on November 1st. In that case, there still is a window of time for ASSA to come back and file, to petition to reinstate the registration and to submit their Section 8 evidence and data. It's still not closed. I mean, it's not as though the ASSA decision is final. May I suggest, and I'll certainly give you, Mr. Bushnell, a chance to respond as well. May I suggest that you write to us within a week, giving us five pages of explanation as to what has happened and the implications? Yes. And Mr. Bushnell, you would respond three days after that. Four days. What's that? The period. Well, let's, fine, let's give you four days. To respond with, again, five pages of explanation as to the implications of what's happened. Well, thank you very much, Your Honor. That's very fair. Okay. Thank you, Ms. Kelly. Mr. Bushnell, do you need any more time at this point? Anything you want to say on the record as we have it? That's all we're talking about. I don't know if you... Or any response you have to the court's proposed procedure. Yeah. Judge Markey used to do that from the hip, grab the solicitor from the back and send them off with the inventor to write new claims. But yeah, he did. And Judge Rich never objected. But yeah, when Charlie Hyken would come down here with a trademark and a patent, and Judge Rich would repeatedly trip him up with jelly bean analogies and other, he did. I'm asking you whether you have any objection to the court's proposed... No objection to the court's proposal. Judge Markey did it many times. On the grace period, that six months that has expired as of the 25th... That can all be explained in any subsequent filing. As to the likely, or excuse me, as to the near-identicality of the description of goods or the identification of goods. That doesn't mean the goods are identical. Fishing lures manufacturers don't do that, and lock manufacturers stopped that 100 years ago. They don't make each other's products. That's a tribute to what the PTO calls manual... I didn't find anything in your brief addressing the determination that it was the same products at issue. I believe I said that's a tribute in the brief, one of the briefs someplace, unless we had to cut it out to meet the page limit. That's a tribute to the US PTO's manual of acceptable goods and services. They want you to shoehorn in the disclaimer using only these words, same thing with goods and services. Although they admit they're way behind the PTO in definition of goods. There are no twin cylinders anywhere. You put your key in your lock, you turn it with one twist. What I said in 2003 or 4, I'm speculating on where ASSA was going with that trademark. They never went there. There's no goods. If they had on that cylinder instead of best, it would say ASSA twin ITO. That's what lock manufacturers do, so the mechanic knows what he needs, what he set. As to the obvious differences, this is a trademark. It's not 103A. But even in 103A, we have to weigh the differences in the entirety of the subject matter as a whole. Your time's expired. Do you have any final thought, Mr. Bushnell? Yes, overall on the inside flap, where there was an appropriation of the house more registration was refused. Thank you, your honor. Thank you. Are there any questions about the procedure that the court has put in place? I'd just like to clarify the- Please stand when you address the court. Thank you. Sorry. I'd just like to clarify the time frame again. You have one week to give us a five-page response. It goes a little- It's not going to be five pages. Five pages is the upper limit. And the implications and any argument you want to add. And then, Mr. Bushnell, you'll have four days after that. So you're looking at 11 days from today. You'll have your five pages to the clerk. Thank you, your honor. Any further questions? Do we keep it short enough? Thank you. That'll be all.